Cynthia D. CURRY, Appellee,

v.

DISTRICT OF COLUMBIA, Appellant.

No. 98–7121.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 15, 1999.

Decided Nov. 9, 1999.

Donna M. Murasky, Assistant Corporation Counsel, argued the cause for the appellant. Jo Anne Robinson, Interim Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on brief.

Elizabeth Margaret Boyle argued the cause for the appellee. Ted Justice Williams was on brief.

Before: WALD, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed PER CURIAM.

Circuit Judge KAREN LeCRAFT HENDERSON filed a separate opinion.

Circuit Judge WALD filed a separate opinion.

Circuit Judge RANDOLPH filed a separate opinion.

PER CURIAM:

In accordance with the accompanying separate opinions, the district court's order denying the motion for judgment as a matter of law is affirmed in part and reversed in part and the district court's judgment on the verdict for plaintiff is affirmed.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Cynthia D. Curry brought suit against her employer, appellant District of Columbia (District), claiming sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* The source of the alleged sexual harassment was a co-worker in the District's Metropolitan Police Department (MPD). Following trial in the district court, a jury awarded Curry $100,000 in damages. The District filed a *motion for* judgment as a matter of law or, in the alternative, for a new trial or remittitur. Upon the district court's denial of its motion, *Curry v. District of Columbia,* 9 F.Supp.2d 1 (D.D.C.1998), the District appealed. On appeal, the District challenges both the jury's finding of liability and the award of damages. As explained below,

we affirm the district court's denial of post-trial relief in part and reverse in part. In addition, I would remand for further proceedings as to damages.

## I.

Curry joined the MPD as a uniformed officer in October 1986. Six years later, she was transferred to the Domestic Security Section of the MPD's Intelligence Unit where she met Detective Condwell Freeman. Curry and Freeman soon began an intimate relationship which lasted about six months and then "just ended" in April 1993. Joint Appendix (JA) 111.

In July 1993 Curry was again transferred to a different unit and did not return to the Intelligence Unit until the following May. Upon Curry's return, Freeman began a daily routine of telling her sexual jokes and suggesting, while grabbing his crotch, that she allow him to "slip her the lizard."[1] JA 112–13. This conduct continued from mid-May 1994 until August 12, 1994, when Curry stopped speaking to Freeman.

In early September 1994 Curry told Sergeant Jacob Major, who was her (and Freeman's) direct supervisor, that Freeman had been sexually harassing her. Her report followed a three-week period for which Major, who was on vacation during that period, had appointed Freeman acting sergeant in charge of the Unit. Upon his return, Major admonished Curry for submitting an untimely report. Curry explained that she had completed the work but waited for Major's return before resubmitting the report because she wanted to avoid Freeman.[2] Major then referred Curry to the MPD Labor Relations, EEO Office. Adhering to the MPD's formal complaint procedure, Major initially denied Curry's request that he speak with Freeman about the problem. Subsequently, however, Major asked Freeman about the allegations, which Freeman denied, and advised Freeman that sexual harassment would not be tolerated. Major also alerted Lieutenant Cheryl Peacock, the MPD's EEO Officer, to Curry's complaint. Although Curry did not contact the EEO Office until September 30, Peacock began to investigate the matter immediately. The investigation lasted over four months and included interviews of Freeman and other co-workers.

On September 30, 1994 Curry filed a complaint with the MPD's EEO Office. Earlier that day, Freeman, while speaking loudly to a third party in earshot of Curry, had stated repeatedly that he would sue anyone who made unsubstantiated allegations against him. Curry at that time told Peacock about Freeman's "lizard" remarks, including that they had ceased. She also reported the incident involving the redrafted reports when Freeman was acting sergeant and Freeman's remarks she had overheard that morning. Curry reported no other form of harassment. Shortly thereafter, she requested and received a transfer to the Analytical Section of the Intelligence Unit, which was on the same floor as the Domestic Security Section but in a different wing of the building. JA 497. Roughly ten months later, during August 1995, the MPD undertook a wholesale reorganization of its offices which put Curry's and Freeman's offices in closer proximity.

On January 23, 1995[3] the EEO Office issued a report on its investigation of Curry's charges. The report found probable

---

1. Curry understood from their earlier relationship that Freeman's references to "lizard" and "zard" meant his penis.

2. Freeman had ordered Curry to make corrections to the first draft of the report. Finding certain corrections had not been made, Freeman demanded them again for the second draft. Curry told him she thought he was harassing her for rebuffing his sexual overtures and that she intended to wait for Major's return before re-submitting the report.

3. The EEO Office's investigative report bears a January 23, 1996 date stamp. JA 771. As the parties and the record make clear, the correct date of the report is January 23, 1995. *See* Br. of Appellant at 14; Br. of Appellee at 3; JA 798.

cause to believe Freeman had verbally harassed Curry, that is, probable cause "to sustain the allegations that sexual harassment has occurred."[4] JA 776. Peacock, the investigating officer who authored the report, testified that "the workplace ... was filled with sexual jokes, sexual language." JA 306. Captain Alan Dreher, the head of the Intelligence Unit, learned of the report and personally admonished Freeman that sexual harassment would not be tolerated and, if it was going on, it was to stop. The EEO Office advised Curry by letter that she could file a complaint with the District's Department of Human Rights and Minority Business Development (DHR).[5] The EEO Office's finding notwithstanding, the MPD's collective bargaining agreement and D.C.Code § 1–617.1(b–1)(1) (1992)[6] prohibited the MPD from taking disciplinary action against an officer more than forty-five days after the MPD became aware of the officer's improper conduct. Peacock's investigation took more than forty-five days to complete and the District took no formal disciplinary action against Freeman. In June 1996 Curry transferred to the Court Intelligence Unit.

Although she made no mention of it until November 1995, Curry also claimed Freeman regularly glared at her in a harassing manner from the time his verbal harassment ceased in August 1994 until her June 1996 transfer out of the Unit. She testified that Freeman "would look at [her] in a way that made [her] most uncomfortable,

as if he was undressing [her]." JA 235. Although Curry never invoked the MPD's formal complaint procedure with regard to Freeman's glaring, she did report it to supervisory personnel. She first complained on November 7, 1995, during a telephone conversation initiated by Lieutenant Emmogean Simpson–Jones of the MPD's Labor Relations, EEO Office, who asked her how things were going. Although the record is unclear, apparently sometime between November 7 and December 14, 1995 Curry also requested that the MPD transfer Freeman. On December 14, 1995 the EEO Office issued a memorandum in which the MPD's EEO Director Brenda Wilmore noted that Curry complained she was "experiencing a 'hostile environment,' because [Freeman] constantly 'glare[d]' at [her]" and that there was "no verbal communication" between the two. JA 760. The memorandum concluded that "agency constraints" left the EEO Office unable to act on her request to transfer Freeman.[7] The Director did offer to help Curry transfer if she so desired. At that time Lieutenant Alton Bigelow, another EEO officer, advised Freeman of Curry's report about his glaring and "warned him against acts of intimidation." JA 764. Bigelow asked Freeman to agree to a transfer, a request Freeman declined.[8]

## II.

■■■ This court reviews *de novo* the trial court's denial of a motion for judg-

---

4. The report responded to Curry's formal complaint of verbal harassment.

5. The MPD's EEO Office and the parties refer to the DHR as the "Office of Human Rights" and the "OHR." *E.g.*, JA 798. Its proper name is as noted in the text. JA 761. Ultimately, on June 10, 1996 the DHR also found probable cause to believe that Freeman sexually harassed Curry. JA 761.

6. In 1995 section 1–617.1(b–1)(1) provided that "no corrective adverse action shall be commenced pursuant to this section more than 45 days ... after the date that the agency knew or should have known of the act or occurrence allegedly constituting cause." It

has since been repealed. *See* D.C.Code § 1–617.1 (1999).

7. The memorandum uses the term "agency constraints" without elaboration. Although there was evidence that the term referred to the forty-five day rule, JA 378, 380, apparently the MPD's collective bargaining agreement prohibited an officer's involuntary transfer for disciplinary reasons, the precise request Curry made regarding the glaring. *See* Br. of Appellant at 15; JA 538.

8. Curry testified that she also reported the glaring to Bigelow but the record does not reflect when or how. JA 285.

ment as a matter of law or, in the alternative, for a new trial. *Swanks v. Washington Metro. Area Transit Auth.*, 179 F.3d 929, 933 (D.C.Cir.1999). The jury verdict stands "unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree on the verdict." *Smith v. Washington Sheraton Corp.*, 135 F.3d 779, 782 (D.C.Cir.1998) (internal quotation marks omitted). Nevertheless, evidence supporting the verdict must be "more than merely colorable; it must be significantly probative." *Id.* (internal quotation marks omitted).

## A.

 Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A claim of sexual harassment is cognizable under this provision if the alleged harassment alters, either explicitly or constructively, the terms or conditions of an individual's employment. *See, e.g., Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67–68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Courts describe an explicit alteration as "*quid pro quo*" harassment and a constructive alteration as "hostile work environment" harassment. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). To be actionable, however, the latter must be severe or pervasive. *Id.*; *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1002–03, 140 L.Ed.2d 201 (1998); *Harris v. Forklift Sys., Inc.*, 510

U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

An employer's liability for a hostile work environment sexual harassment claim differs depending on who does the harassing. The harasser can be a supervisor or someone else whose position in the workplace affords authority over the target of the harassment such that the harasser is aided by the "agency relation" in harassing the other employee. *Ellerth*, 524 U.S. at 760–63, 118 S.Ct. 2257; *see Mikels v. City of Durham*, 183 F.3d 323, 331–32 (4th Cir. 1999) ("The fundamental determinant of this form of vicarious liability is not, therefore, the harasser's formal rank vis-a-vis that of the victim in the particular employment hierarchy, ... but whether the particular conduct was aided by the agency relation.") (internal quotation marks omitted). The United States Supreme Court recently clarified the employer liability standard for supervisory harassment of an employee in *Ellerth* and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).[9] There the Supreme Court further noted that circuit courts had not determined employer liability for co-worker harassment in the same way. *See Faragher*, 524 U.S. at 799, 118 S.Ct. 2275. In *Faragher* the Court further noted and declined to disturb the general agreement among circuits that a negligence standard governs employer liability for a co-worker's harassment. *Id.* at 799–801, 118 S.Ct. 2275. Every circuit that has addressed co-worker harassment in the "post-*Faragher* era" has distinguished the standard applicable to co-worker harassment from that governing harassment by a supervisor, applying to the former a variation of the negligence standard the circuit had applied pre-*Faragher*.[10]

9. The Supreme Court announced *inter alia* that the employer can be held vicariously liable even if the employer did not know of the harassment. If no "tangible employment action" results from the harassment, the employer may avoid liability by asserting a two-part affirmative defense. *See Ellerth*, 524

U.S. at 764–65, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 804–07, 118 S.Ct. 2275.

10. *See Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 441 (2d Cir. 1999) (discussing *Faragher* and then concluding "[i]n contrast, if the harasser is the victim's co-worker, the employer will be liable

■ While the reasonableness of an employer's response to sexual harassment is at issue under both standards, the plaintiff must clear a higher hurdle under the negligence standard, where she bears the burden of establishing her employer's negligence, than under the vicarious liability standard, where the burden shifts to the employer to prove its own reasonableness and the plaintiff's negligence. *See Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 n. 2 (7th Cir.1999) ("[T]he reasonableness of the employer's actions in preventing and responding to sexual harassment is relevant under both standards, the difference being who bears the burden of proof."). Indeed, in *Faragher* the Supreme Court reasoned that a supervisor's harassment is both more detrimental (or threatens to be) to the terms and conditions of an individual's employment and more difficult to stop or have stopped than similar behavior by a co-worker. *See Faragher*, 524 U.S. at 803, 118 S.Ct. 2275. Moreover, the employer has a greater opportunity to guard against the misconduct of supervisors than that of fellow employees, *see id.*, and, inversely, an employee has a greater opportunity to stop harassment by a co-worker in the first instance. *See id.* ("When a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor . . . .").

■ Our circuit has not articulated an employer liability standard for co-worker harassment since the *Faragher* and *Ellerth* decisions nor had it squarely done so before.[11] Consistent with the approach of our sister circuits recognized in *Faragher*, 524 U.S. at 799, 118 S.Ct. 2275, we announce the following standard:[12] An employer may be held liable for the harassment of one employee by a fellow employee (a non-supervisor) if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action.[13]

only if it is negligent, that is, if it either provided no reasonable avenue for complaint or knew of the harassment and did nothing about it") (internal quotation marks omitted); *Mikels*, 183 F.3d at 332 (no vicarious liability for co-worker harassment); *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir.1999) (imposing liability if employer "knew or should have known of the harassment in question and failed to take prompt remedial action" and noting standard "was not disturbed by *Faragher* or *Burlington*"); *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir.1999) (stating "[e]mployer liability for co-worker harassment is based directly on the employer's conduct" and employer is liable if it "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action"); *Wilson v. Chrysler Corp.*, 172 F.3d 500, 508 (7th Cir.1999) ("Liability for co-worker harassment requires a showing of negligence . . . [so] a plaintiff must show that her employer failed to take reasonable steps to discover and remedy the harassment."); *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 987 (8th Cir.1999) (noting distinction between types of harassment and stating "[o]ur court has long recognized that an employer may be directly liable . . . if it knew or should have known of the conduct and failed to take proper remedial action"); *Burrell v. Star Nursery,*

*Inc.*, 170 F.3d 951, 955 (9th Cir.1999) (employer liable only for what management knew or should have known in co-worker harassment scenario); *Wilson v. Tulsa Junior College*, 164 F.3d 534, 541 n. 4 (10th Cir.1998) (noting distinction between vicarious liability and negligence standard).

11. In *Vinson v. Taylor*, 753 F.2d 141 (D.C.Cir. 1985), the court distinguished, in a footnote, a case involving harassment by a supervisor from those involving harassment by co-workers "who differ radically from supervisors in the scheme of vicarious liability." 753 F.2d at 147 n. 45. And in a supervisor harassment case, *Gary v. Long*, 59 F.3d 1391 (D.C.Cir. 1995), we noted without comment the parties' recognition that the negligence standard applies in certain circumstances. 59 F.3d at 1397.

12. Both parties get the standard wrong, to wit: Curry asserts that the employer liability standard for supervisory harassment applies, Br. of Appellee at 10–14, and the District proposes a modified supervisory harassment standard for co-worker harassment, Br. of Appellant at 28–31.

13. The district court's jury charge used a negligence standard: "Plaintiff must prove that

■ Curry's complaint specified two kinds of harassment for which we must determine whether a reasonable jury could find that the District knew or should have known of the harassment and failed to implement prompt and appropriate corrective action.[14] The first occurred from May 1994 to mid-August 1994 and consisted of Freeman's blatantly sexual remarks. No supervisor ever heard them. Neither Curry nor anyone else made them known to a supervisor or EEO official until after the conduct had ceased. Although a reasonable jury could have found from the evidence that Curry's workplace was filled with sexual banter, that fact alone cannot support a finding that the District should have known of Freeman's harassment of Curry, especially in the absence of any similar problems or complaints. The District had in place a policy against harassment, it had made its policy known and it had established an effective complaint procedure. The District, therefore, was entitled to rely on its employees to bring problems with their co-workers to its attention.

■ Once Curry reported the harassment, the District responded quickly and reasonably. Major advised EEO Officer Peacock of Curry's complaint even before Curry lodged a formal complaint and Peacock began her investigation immediately. Major also admonished Freeman that, if he was harassing Curry, he was to stop immediately. The probable cause finding four months later led to a similar warning by Captain Dreher, the head of the Intelligence Unit. Although the District took no formal disciplinary action, the clear, prompt admonitions were appropriate and, at least for this conduct, effective. Accordingly, we conclude that the evidence supporting the verdict as to Freeman's verbal harassment occurring between May and August 1994 was, at most, "merely colorable," *Smith*, 135 F.3d at 782, and we therefore reverse the district court's denial of the District's motion for judgment as a matter of law to the extent it encompasses that conduct.[15]

management level employees knew or should have known of the alleged sexual harassment . . . and failed to take immediate and appropriate corrective action." JA 742–43. Delay inherent in personnel actions, however, particularly in large organizations, does not necessarily render an otherwise reasonable response inadequate. *See Waymire v. Harris County*, 86 F.3d 424, 429 (5th Cir.1996) ("[I]n analyzing the promptness of response it is important to keep in mind the entity's lines of command [and] organization format.") (internal quotation marks omitted); *see also Dhyne*, 184 F.3d at 988 ("An employer must be allowed some time to gauge the credibility of the complainant and the seriousness of the situation if we are to observe the Supreme Court's caution that Title VII is not 'a general civility code for the American workplace.' ") (quoting *Oncale*, 523 U.S. at ——, 118 S.Ct. at 1002).

14. Given the differences in Freeman's behavior (explicitly sexual verbal harassment at first and silent "glaring" subsequently) and, more important, the manner in which Curry handled each (Curry applied self-help to the verbal harassment and reported it after it had ceased while she waited more than one year before complaining about the glaring), we believe each kind of harassment, and the District's responses thereto, should be analyzed separately. *Cf. Sabree v. United Bhd. of Carpenters and Joiners Local No. 33*, 921 F.2d 396, 401–02 (1st Cir.1990) (no continuing violation because plaintiff "believed, at every turn, he was being discriminated against" but failed to file timely claim for earlier incidents); *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 483 (3d Cir.1997) (continuing violation where harassment intensified after plaintiff filed EEOC charge); *see generally West v. Philadelphia Elec. Co.*, 45 F.3d 744, 755–56 (3d Cir.1995) (in determining continuing violation *vel non*, court considered similarity, continuity and frequency of offensive conduct and whether harassment caused discrete event triggering duty to assert rights); *Berry v. Board of Supervisors*, 715 F.2d 971, 981 (5th Cir.1983) (setting forth three factors for determining if plaintiff alleges continuing violation: (1) subject matter; (2) frequency; and (3) degree of permanence which, *inter alia*, may trigger plaintiff's duty to assert rights).

15. Judge Wald is "puzzled" by this statement (Op. of Wald, J. at 665) and is "unclear what exactly the panel is reversing, and why." (*Id.* at 665.) The jury verdict necessarily determined the District's liability for the verbal

According to Curry, the second type of harassment began when the first ended. Thus, from mid-August 1994 until her transfer in June 1996, Curry experienced sexual harassment in the form of Freeman's glaring at her.[16] Nevertheless, Curry *first* brought this harassment to light on November 7, 1995 in response to a supervisor's inquiry. Until then, the District reasonably believed all problems between Curry and Freeman had been resolved. She never filed a formal complaint regarding Freeman's glaring. In response to the complaint Curry did voice to Simpson–Jones over the telephone, however, an EEO officer (Bigelow) simply told Freeman about the complaint, warned him against the objectionable conduct (which he denied) and requested that he voluntarily transfer. EEO Director Wilmore then sent Curry a memorandum informing her the only available remedy was her own transfer. In view of this evidence, especially the fact that Freeman by this point was a "repeat offender," *see Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir.1998),[17] we cannot say that "the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree" on the adequacy of the District's response once it knew of Freeman's glaring. *Smith*, 135 F.3d at 782. We therefore affirm the district court's denial of the

16. Although the District, in its post-trial motion below, disputed the hostile work environment finding based on Freeman's glaring JA 808, it does not raise the issue on appeal. If it had, this appeal might have been disposed of at an earlier analytical stage, namely, in determining whether the conduct is sufficiently severe to create a hostile work environment. "Discriminatory conduct results in a hostile work environment when it is so severe or pervasive that it create[s] a work environment abusive to employees because of their race, gender, religion, or national origin, thus offending Title VII's broad rule of workplace equality." *Park v. Howard Univ.*, 71 F.3d 904, 906 (D.C.Cir.1995) (quoting *Harris*, 510 U.S. at 22, 114 S.Ct. 367) (*internal quotation marks omitted*). In determining if the plaintiff satisfies this requirement, the court must consider all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utter-

sexual harassment. The district court then denied the District's motion for judgment as a matter of law and, to the extent its denial reaffirmed the District's liability for the verbal sexual harassment, we reverse that denial—in short the District is not liable to the plaintiff for the verbal sexual harassment because it had no notice of the conduct until after the conduct had ceased. Its response once it learned of the conduct was appropriate as a matter of law. The District *is* liable, however, for the subsequent nonverbal harassment, and we therefore partially affirm the district court's denial of the District's post-trial motion, because we cannot conclude as a matter of law that the District's response was appropriate once it learned of the nonverbal harassment.

ance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367. Other courts have held that a co-worker's staring, even when accompanied by physical touching, is not conduct severe enough to alter the *terms and conditions of an individual's* employment. *See generally Adusumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir.1998) (teasing plaintiff, police department employee, that waving at squad cars makes her look like prostitute, comments to her about bananas, rubber bands and low-neck tops, staring and attempts to make eye contact and four isolated incidents in which co-worker briefly touched plaintiff's arm, fingers or buttocks fall within the "safe harbor for employers"); *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir.1999) (stares and arm touching were not severe where none was physically threatening or likely to undermine reasonable plaintiff's workplace competence).

17. "The employer is, of course, obliged to respond to any repeat conduct; and whether the next employer response is reasonable may very well depend upon whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective." 144 F.3d at 676; *see also Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir.1999) ("Factors in assessing the reasonableness of remedial measures may include the amount of time that elapsed between the notice and remedial action, the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination, and *whether or not the measures ended the harassment*.") (citations omitted) (emphasis added).

District's motion for judgment as a matter of law with regard to Freeman's glaring.[18]

### B.

The District challenges the district court's denial of its post-trial motion requesting, in the alternative, remittitur of the $100,000 damages award. *See* 9 F.Supp.2d at 4. We order remittitur only where, after a "detailed appraisal" of the evidence bearing on damages, we find the award grossly excessive. *See Grunenthal v. Long Island R.R. Co.*, 393 U.S. 156, 159, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968). An award is grossly excessive if "it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Langevine v. District of Columbia*, 106 F.3d 1018, 1024 (D.C.Cir.1997) (quoting *Williams v. Steuart Motor Co.*, 494 F.2d 1074, 1085 (D.C.Cir.1974)). We allow remittitur, however, "only if the reduction permits the highest amount the jury tolerably could have awarded." *Langevine*, 106 F.3d at 1024 (quoting *Carter v. District of Columbia*, 795 F.2d 116, 135 n. 13 (D.C.Cir.1986)) (internal quotation marks omitted).

The jury's liability verdict itself reveals the district court's legal error in denying a new trial on damages. As the trial court's order makes clear, the court and the jury considered the harassment beginning in May 1994, which consisted of the "lizard" remarks, as well as the glaring that began some three months later. With the District's liability limited to the "glaring" harassment, Curry's damages must likewise be limited: she can recover only for the glaring that occurred after she reported it on November 7, 1995 and continued until her departure in June 1996. At trial, however, the damages evidence covered, as the district court emphasized, *see* 9 F.Supp.2d at 4, a two- year period as opposed to the eight months for which the District can be held liable. Moreover, Curry's physical problems, including acne, nightmares, headaches, loss of appetite and accompanying weight loss, occurred sometime in 1994, nearly one full year, if not more, before she reported the glaring. The corroborating testimony of both Curry's sister and Curry's prayer partner, which described a "dramatic change in [Curry's] appearance and behavior," 9 F.Supp.2d at 4, related to late 1994.[19]

Curry's damages evidence also included the testimony of her pastor and her super-

---

**18.** In addition to challenging liability, the District appeals the trial court's admission into evidence of portions of the DHR probable cause report. Curry disputes that the District preserved its objection below, Br. of Appellee at 16, and the record is unclear on the issue. *Compare* Reply Br. at 18 *and* JA 6–32 *with* JA 149–56, 371–77. Assuming *arguendo* the District properly objected below, its objection was based on Rule 403, Federal Rules of Civil Procedure, and we believe the district court's reasons are sufficient for us to conclude that it did not abuse its discretion in admitting the evidence. *See* 9 F.Supp.2d at 3–4.

The District also challenges the district court's failure to charge the jury that an employee who at one time has a consensual intimate relationship with a co-worker is obliged to tell the coworker that advances are no longer welcome. Whether familiarity of a sexual nature is "unwelcome" is a question of fact. *See Meritor*, 477 U.S. at 68, 106 S.Ct. 2399 ("[T]he question whether particular conduct was indeed unwelcome ... turns largely on

credibility determinations committed to the trier of fact, ... [and t]he correct inquiry is whether respondent by her conduct indicated that the alleged sexual advances were unwelcome. ..."). Here, the district court properly presented to the jury Curry's and Freeman's past history as a factor for it to consider in determining harassment *vel non*. JA 743 ("The Defendant contends that Detective Curry had engaged in welcome sexual conduct with Detective Freeman and therefore, she had a burden to inform the District when the conduct became unwelcome, which she failed to do."). The lapse of time between the end of their relationship and the alleged harassment, coupled with Freeman's persistence in spite of Curry's unresponsiveness, are sufficient to support a finding of harassment.

**19.** Although her sister testified that Curry's acne was "just now starting to clear," JA 426, Curry testified only to physical problems that developed "when [the harassment] first started occurring." JA 170.

visor after she transferred to the Court Intelligence Unit in June 1996. Curry's pastor, Reverend Thomas J. Baltimore, testified that he had counseled her for more than three years. The two worked "through a number of crises" which, apart from the workplace harassment, included her father's death and "conflicts" with other family members and fellow church members. JA 477–78. Baltimore testified that he continued to counsel Curry, who "worries [him] to death." JA 477. William E. Wagner, her supervisor after she transferred, testified that Curry was emotionally upset in July 1996, as manifested by her difficulty in concentrating and sitting still and by "paranoi[a] in her work."[20] JA 472. Curry eventually told him that her problems related to the pending sexual harassment litigation. Curry also testified that she was reluctant to seek counseling from a psychiatrist or psychologist because she feared it would jeopardize her eligibility to obtain a higher level of security clearance which she eventually attained.

In my view, the damages award exceeds "the maximum limit of a reasonable range" of damages for Freeman's glaring harassment which occurred over a period of eight months and caused Curry some degree of emotional upset. Although Freeman and Curry apparently had nearby offices during that time, they no longer worked together. Assuming the glaring occurred every time Curry saw Freeman, her contact with him was isolated, incidental to her law enforcement duties and passing. On these facts, I believe that an award of $100,000 in damages is grossly excessive. *See, e.g., Hutchinson v. Stuckey*, 952 F.2d 1418, 1422 (D.C.Cir.1992) ($50,000 was excessive for permanent "significant injury" to finger); *Johnson v. Parrish*, 827 F.2d 988, 991 (4th Cir.1987)($150,000 was exces-

sive for partially disabling neck and arm injury).

## III.

For the foregoing reasons, the district court's denial of the District's motion for judgment as a matter of law or, in the alternative, for a new trial or remittitur is affirmed in part, that is, as it relates to the District's liability for the sexual harassment Curry first reported in November 1995. With regard to the District's liability for harassment occurring before that date, the district court's denial of the motion for judgment as a matter of law is reversed. I would remand the damages award to the district court for further proceedings consistent with this opinion. *See Hutchinson*, 952 F.2d at 1423 n. 5.

WALD, Circuit Judge:

The Supreme Court recently defined negligence by an employer in the Title VII context: "An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). There is ample evidence in this record to support the jury's verdict that the District of Columbia was negligent in not stopping the sexual harassment of Det. Cynthia Curry by Det. Condwell Freeman, and that because of its negligence Curry suffered $100,000 worth of damages.

At the outset, I agree with my colleagues that no finding of liability could be sustained against the District based solely on its conduct in the period May–August 1994, since there is not sufficient evidence on this record that the District was on notice of Freeman's harassing behavior until Curry's complaint in September 1994.[1]

---

**20.** Wagner described Curry's paranoia as follows: "She would do something and immediately bring it to me for approval to see if it was done properly. Overly to the point where I spent a lot of time just overlooking

her work that she did because she would keep bringing it to me." JA 472.

**1.** This is not to say, of course, that actual notice is always required to hold an employer liable for co-worker sexual harassment under

I am somewhat puzzled, however, by my colleagues' statement that "we ... reverse the district court's denial of the District's motion for judgment as a matter of law to the extent it encompasses that conduct." Henderson Op. at 661. The district court was quite clear in its denial of the District's motion for judgment as a matter of law (j.m.l.) that "[t]here was sufficient evidence introduced at trial that would support a finding of continued harassment *after the time Defendant claims it had notice.*" *Curry v. District of Columbia,* 9 F.Supp.2d 1, 3 (D.D.C.1998) (emphasis added). Since there is no reason to believe the district court's order was based on faulty analysis, I am unclear what exactly my colleagues are reversing, and why.

 It appears that my colleagues, the district court, and I all agree that the District can be found liable for harassment which occurred after it had notice. *See* Henderson Op. at 660–61, 661–62 n.15. The only question before us then is whether the damages the jury awarded Curry are "beyond all reason or so great as to shock the conscience. Courts may not set aside a jury verdict merely deemed to be generous; rather, the verdict must be so unreasonably high as to result in a miscarriage of justice." *Langevine v. District of Columbia,* 106 F.3d 1018, 1024 (D.C.Cir. 1997) (internal quotation marks and citation omitted). In my view, the jury's award of $100,000 to a police officer who

suffered years of harassment does not remotely qualify as a miscarriage of justice, whether Curry can recover for damages incurred before November 7, 1995, as I would find, or only for damages incurred after that date, as my colleagues find.

"[T]he jury's verdict will withstand challenge unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree on the verdict." *Swanks v. WMATA,* 179 F.3d 929, 933 (D.C.Cir.1999) (quotation marks omitted). I believe on the evidence in the record a reasonable jury could have found the following facts.

Curry was harassed continually from May 1994 until she transferred out of her unit in June 1996. At first, the harassment took the form of daily requests for sexual favors, which Curry testified she told Freeman were not appreciated.[2] After Curry brought this verbal harassment to her supervisor's attention, he went to Freeman and asked him "to stop whatever you are doing to Cindy." J.A. at 786. Freeman then threatened to sue Curry if she pursued a harassment complaint, and said he would "take [her] home and [her] automobile." J.A. at 779. Freeman stopped making his daily requests for sex, but instead began to harass her by glaring at her in an intimidating way and by staring at her as if he were mentally undressing her.[3] After a month or two of this

---

Title VII. *See, e.g., Williamson v. City of Houston,* 148 F.3d 462, 465 (5th Cir.1998) ("[C]onstructive notice can result from showing the pervasiveness of the harassment.") (internal quotation marks omitted); *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 673 (10th Cir.1998) ("[M]any courts have held that the pervasiveness of sexual harassment can properly lead to an inference of knowledge."); *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1016 (8th Cir.1988) (incidents of harassment so numerous that employer held liable for not discovering and ending harassment).

2. Curry stated she did not complain at first about Freeman's behavior because, based on what she had seen happen to other female

police officers, she did not think it would be good for her career if she complained. She seems to have been prescient in that regard.

3. I disagree with the gratuitous dicta in Judge Henderson's opinion that Freeman's glares may not have been sufficiently severe to be actionable under Title VII. *See* Henderson Op. at 662 n.16. Whether harassing behavior was sufficient to create a hostile work environment is an intensely fact-based question. *See Howard v. Burns Bros.,* 149 F.3d 835, 840 (8th Cir.1998) ("Once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury."); *Paroline v. Unisys Corp.,* 879 F.2d 100, 105 (4th Cir.1989) ("Whether Moore's

behavior, Curry sought a transfer out of her office to avoid Freeman.

The Metropolitan Police Department investigated Curry's complaint and concluded that there was probable cause that Freeman was verbally harassing Curry. However, the Department was unable to take any action against Freeman because its investigation took roughly four months, and then-D.C. law prohibited disciplining an MPD employee more than 45 working days after the Department had notice of the cause for discipline. MPD could not even transfer Freeman to another unit without his consent, which he declined to give. Freeman's supervisor testified that he did not learn the results of the Department's investigation of Freeman until trial, and expressed his view that "[i]t would gain the Department nothing for me to know" that the investigation had found probable cause that Freeman was harassing Curry. J.A. at 537. Similarly, a year later, when Curry complained about the constant glaring she was experiencing, the MPD told her that it was unable to do anything to help her.[4] Meanwhile, Curry was ostracized as a result of the complaints she filed.

harassment was sufficiently severe or pervasive is quintessentially a question of fact."), *vacated in part on other grounds*, 900 F.2d 27 (4th. Cir.1990) (en banc). The fact that other courts have found harassing behavior which included staring not to be actionable does not establish any sort of generalization that "a coworker's staring, even when accompanied by physical touching, *is not conduct severe enough*" to be actionable. Henderson Op. at 662 n.16. There was ample evidence presented that Freeman's harassment affected Curry's ability to work, and it is far from clear that no reasonable person would have been affected by Freeman's intimidation tactics. Cf. *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir.1999) (finding boorish behavior *not actionable because it did not undermine plaintiff's workplace competence*); see also *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 536 n. 18 (7th Cir.1993) (mere presence of an employee who has engaged in particularly severe harassment can create hostile work environment); *Ellison v. Brady*, 924 F.2d 872, 883 (9th Cir.1991) (same).

Given this record evidence, I cannot credit my colleague's confident assertion that the District "had established an effective complaint procedure." Henderson Op. at 661. The record shows that the only results of Curry's two complaints made a year apart were requests that Freeman stop harassing Curry (which did not stop the harassment), an investigation which substantiated Curry's allegations (but whose results were never shared with Freeman's supervisor), and the ostracism of Curry.[5]

This meager response is not, in my view, consistent with what courts have required of a reasonable employer under Title VII. "Title VII requires more than a mere request to refrain from discriminatory conduct." *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir.1991). Where evidence of harassment exists, an employer cannot avoid liability by simply making known a general policy against harassment. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 665 (6th Cir. 1999); *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir.1998) ("Courts have explained that simply indicating to a perpetrator the existence of a policy against harassment is usually insuffi-

4. An officer did ask Freeman to stop harassing Curry, but that request had no effect.

5. In its effort to support the notion that the District acted "quickly and reasonably," Judge Henderson's opinion considerably overstates the evidence about what Freeman's supervisors said to him. *See* Henderson Op. at 661. Far from issuing "clear, prompt [and effective] admonitions," *id.*, Freeman's supervisors merely indicated in general terms that sexual harassment was not acceptable, and that *if* it was going on it should stop. *See* J.A. at 340–43, 496. There was no evidence that once the MPD concluded that Freeman had been harassing Curry it said anything more serious to him. In fact, the Department did not think it necessary to share the results of the investigation with Freeman's supervisor. Further, I do not consider the "admonitions" to have been effective or adequate, since their only apparent effect was to convert Freeman's harassment from verbal requests for sex into silent but intimidating, sexually evaluative stares.

cient."); *cf.* J.A. at 342–43 (Capt. Dreher testifying that "in the aftermath" of Curry's complaint, he "let it be known verbally to my officials to pass along that it wouldn't be tolerated in the workplace"). This court has previously found that agency managers should "promptly take all necessary steps to investigate and correct any harassment, including warnings and appropriate discipline directed at the offending party." *Bundy v. Jackson*, 641 F.2d 934, 947 (D.C.Cir.1981) (Wright, J.); *accord Yamaguchi v. United States Dep't of the Air Force*, 109 F.3d 1475, 1482 (9th Cir.1997) (remedial measures must be reasonably calculated to end the current harassment and to deter future harassment).

It is undisputed that Freeman was never disciplined for his harassment. At the very least, a reasonable juror could conclude that the failure to take any action against Freeman for his verbal harassment contributed to Freeman's decision to continue to harass Curry by staring at her. "Employers send the wrong message to potential harassers when they do not discipline employees for sexual harassment." *Ellison*, 924 F.2d at 882. "Title VII does not permit employers to stand idly by once they learn that sexual harassment has occurred. To do so amounts to a ratification of the prior harassment." *Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir.1995). "In such instances, the combined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy." *Faragher v. City of Boca Raton*, 524 U.S. 775, 789, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Thus I believe that under precedent from the Supreme Court, this court, and our sister circuits, the District could be held liable for failing to take action to deter future harassment once it had knowledge of the harassment in September 1994.

A reasonable juror, admittedly, might have concluded that the District's "admonitions" were sufficient to deter future harassment. *Compare Yamaguchi*, 109 F.3d at 1483 ("[T]o avoid liability an employer must take at least some form of disciplinary action against a harassing coworker . . . ."), *with Knabe v. Boury Corp.*, 114 F.3d 407, 412 n. 8, 414 (3d Cir.1997) (remedy may be adequate as a matter of law even where it fails to stop harassment, so long as it could reasonably have been expected to deter harassment; punitive action not always necessary). But surely a reasonable juror would not be compelled to reach that conclusion. *See, e.g., Adler*, 144 F.3d at 676 ("Repeat conduct may show the unreasonableness of prior responses."); *Paroline v. Unisys Corp.*, 879 F.2d 100, 106–07 (4th Cir.1989) (reasonable fact finder could conclude that severe warning, delayed salary increase, and similar punitive measures not adequate remedies), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir.1990) (en banc).

My colleagues override the jury and the district court in finding that the District cannot be held liable for harassment occurring between September 1994 and November 1995 by viewing the two phases of Freeman's harassment, the verbal phase and the staring phase, as totally separate and unconnected. It is of course possible that a reasonable juror could also view the situation in such a fragmented way, so that Curry's complaint about the verbal aspect of Freeman's behavior provided no notice to the District that Freeman might continue to harass her in other ways, and thus the District had no remedial obligation following notice of the verbal harassment because it did not recur in that precise form. *But cf. Fuller*, 47 F.3d at 1529 (city always has obligation to take remedial actions against harasser once it learns of harassment); *Paroline*, 879 F.2d at 107 (employer's knowledge of prior harassment sufficient to impute liability for later harassment in the absence of adequate remedial measures).

However, it certainly cannot be assumed that all reasonable jurors would have to view the evidence of harassment in that compartmentalized way. In fact, it does not appear the MPD itself understood Curry's complaint about glaring as completely separate from the earlier harassment. If it had, then nothing would have barred the Department from disciplining Freeman for the glaring—because the 45–day clock was triggered only when the Department learned of a reason for discipline. Yet, when Curry complained that Freeman's glaring was creating a hostile work environment, the MPD told her, in less than 40 days, that it was unable to take any action to solve the problem. The only reasonable explanation for that powerlessness is that the Department was already on notice of Freeman's behavior, but had failed to act within 45 days.[6] Thus, the MPD believed that Freeman could not be transferred in December 1995, because the MPD had been on notice of his harassment since September 1994. But yet my colleagues say that Curry cannot recover for pre-November 1995 damages, because the MPD was *not* on notice of Curry's ongoing problems with Freeman until November 1995. That result may make sense to my colleagues, but surely not every reasonable juror would be compelled to so conclude.

My colleagues also assert that the District could not reasonably be faulted during the period when the verbal harassment had ceased and Curry had not yet complained to anyone of the staring. But I do not believe that Title VII law supports such a demarcation between the two types of harassment such that the District's obligation to monitor the type of harassment it knew about necessarily stops at the line where a new kind of harassment begins.

The District was on notice that an identified employee had been harassing a co-worker; it may therefore be held responsible for failing to prevent the continuation of that harassment, whether in the same form or a different form, and whether reported or not. *See Sharp v. City of Houston*, 164 F.3d 923, 931 (5th Cir.1999) (police department liable for harassment despite lack of complaint by plaintiff where officer had made harassing remarks in past to other women officers; "despite having been put on notice that [he] might be a problem, [the department] had made no effort to supervise or constrain his behavior"); *Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 784 (10th Cir.1995) (prior harassment of other women can serve as sufficient notice to hold employer liable for harassing conduct of co-worker); *Paroline*, 879 F.2d at 107 (same); *Yates v. Avco Corp.*, 819 F.2d 630, 635–36 (6th Cir.1987) (fact that company was aware that supervisor had harassed women in past and took no remedial action could establish constructive notice of later harassment because it was evidence of harassing tendencies and of the failure of company's antiharassment policy).

Finally, I believe my colleagues misunderstand the extent of an employer's liability for co-worker harassment. Judge Henderson's opinion appears to suggest that an employer's liability only extends to the harassment which occurred after the point at which it had knowledge. But that is not what the cases say. *See Fuller*, 47 F.3d at 1529 (employer who fails to take appropriate remedial action after notice liable for past harassment even where harassment stopped after employer received notice); *see also Knabe*, 114 F.3d at 413–14 (considering whether employer's

---

6. Judge Henderson suggests the possibility that it was the MPD's collective bargaining agreement (CBA) that prevented the transfer of Freeman in December 1995. *See* Henderson Op. at 658 n.7. However, Lt. Peacock's testimony was that the CBA prevented the MPD from transferring an officer as an alternative to discipline, *where discipline was barred by the 45–day rule. See* J.A. at 311–12. Where the 45–day rule was not a barrier to discipline, Sgt. Major testified that transfer of the offending officer was the usual practice when there was probable cause to believe one officer had sexually harassed another officer. *See* J.A. at 537–38.

response was sufficiently reasonable to avoid liability despite fact that plaintiff had quit the day employer responded to her complaint). In fact, the Supreme Court has also indicated that an employer's failure to remedy harassment may constitute ratification of past harassment: "[T]he combined knowledge and inaction may be seen as ... the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy." *Faragher,* 524 U.S. at 789, 118 S.Ct. 2275; *accord Fuller,* 47 F.3d at 1529 (employer's failure to act "amounts to a ratification of the prior harassment"). Thus, regardless of the District's knowledge *vel non* of Freeman's harassment prior to November 7, 1995, its failure to act after that date could be found to constitute "adoption" of Freeman's conduct up to that point.[7]

In the end, we have before us here a classic case of harassment. The evidence shows that Curry was harassed on a continuous basis from May 1994 until June 1996, with only partial relief occasioned by her repeated efforts to transfer away from Freeman, which were temporarily successful in 1995 and finally successful in 1996. The MPD knew of Curry's allegations in September 1994, and concluded they were justified in January 1995. However, MPD was prohibited from doing anything to effectively address the problem by the 45–day rule, so the only actions ever taken in response were vague requests that if harassment were going on, it should stop. Unsurprisingly, given these circumstances,

the harassment did not stop, although it changed to a more subtle form. This case falls squarely within *Ellerth*: "An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it." 524 U.S. at 759, 118 S.Ct. 2257; *see also Faragher,* 524 U.S. at 789, 118 S.Ct. 2275 ("[C]ombined knowledge and inaction may be seen as demonstrable negligence ...."). Thus, I cannot agree with my colleagues that Curry can recover only for harassment which occurred after November 7, 1995.

In sum, I believe that the jury would have been fully justified in awarding Curry compensation for damages suffered before November 1995. But, more than that, I do not believe that the award of $100,000 was excessive, even adopting my colleagues' view that compensable damages could only accrue beginning in November 1995.[8] Judge Henderson states that "the jury considered the harassment beginning in May 1994." Henderson Op. at 663. The jury returned a general verdict. There is simply no evidence in the record as to when the jury found that damages began to accrue, and this court is required to uphold the jury's verdict if there is any reasonable basis for it.[9] Judge Henderson's opinion appears to assume that because the jury heard evidence of damages dating back to 1994, the jury's damage award was based on the period 1994–1996, and therefore the jury would have awarded less had it confined itself to

---

7. There is no reason why this approach is inconsistent with Title VII's " 'primary objective' " of preventing harassment, *Faragher,* 524 U.S. at 806, 118 S.Ct. 2275, since an employer who acts appropriately once it has knowledge will never be liable. On the contrary, it would be strange if the particular date on which an employee made a futile complaint had significance for the amount of damages for which she could recover.

8. It is not at all clear on what basis Judge Henderson's opinion asserts, without citation to the record, that Curry's contact with Freeman after November 1995 was "isolated, inci-

dental ... and passing." Henderson Op. at 664. Freeman testified that during this time his office was roughly 25 feet from her desk. J.A. at 592. I do not see how that fact supports an inference that the two had merely isolated and passing contact with one another, particularly given our deferential standard of review for a jury verdict. *See Swanks v. WMATA,* 179 F.3d 929, 933 (D.C.Cir.1999).

9. Thus, there is no basis in the record for the assertion that "[t]he jury verdict necessarily determined the District's liability for the verbal sexual harassment." Henderson Op. at 661–62 n.15.

the period after November 1995. This inference is irrelevant to our review of a jury verdict. We do not sit to second-guess the jury; we can only order remittitur if the verdict is "beyond all reason." *Langevine*, 106 F.3d at 1024. A reasonable jury could well have found that the harassment which occurred from November 1995 to June 1996, when Curry left the unit, caused Curry to suffer $100,000 in damages, especially when viewed against the backdrop of Freeman's prior harassment.

Similarly, Judge Henderson's opinion appears to place great weight on the fact that Curry's physical problems began to manifest themselves in 1994, "nearly one full year, if not more, before she reported the glaring." Henderson Op. at 663. The fact that Curry had suffered prior to November in no way detracts from her damages from November onward. Curry testified she had nightmares and felt the need to sleep with her gun next to her pillow. Her skin broke out, she had headaches, and lost her appetite. Other witnesses testified that she became extremely nervous and would call her sister almost every night, very late, crying.

Moreover, I can find no evidence to support the suggestion that damages ceased to accrue in June 1996. *See* Henderson Op. at 663 (evidence on damages went beyond "the eight months for which the District can be held liable"). William Wagner supervised Curry after her transfer in June 1996, and he testified that, even in the absence of Freeman, she was "really emotionally upset." J.A. at 470. "[S]he was having problems concentrating with the things that I was trying to discuss with her, almost to the point that she was in tears." *Id.* at 471. Curry's sister testified that Curry's skin problems were, in March 1998, "just now starting to clear." *Id.* at 426. Curry's sister also testified that Curry's face was still "drawn in ... this is not what my sister looked like [before 1994]." *Id.* at 427. Similarly, her pastor testified that he had been counseling her, trying to help her regain her confidence, from late 1994/early 1995 at least until trial in March 1998.

The question then that the jury had to decide was what amount would compensate Curry for the damage she suffered from Freeman's harassment that can be attributed to the District's negligence. There was substantial evidence before the jury that Curry's damages continued until the time of trial, and perhaps have continued to this day. *Cf. id.* at 806 (court instructing jury that it could award damages for "emotional and mental anguish and anxiety the Plaintiff has suffered *or will continue to suffer*") (emphasis added).

"A court must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries." *Langevine*, 106 F.3d at 1024. I see no basis for concluding that an award of $100,000 for eight months of harassment and years of stress is "beyond all reason." *Cf. id.* ($200,000 for largely emotional distress damages from false arrest not excessive); *Smith v. Norwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1417 (10th Cir.1997) ($200,000 emotional distress damages not excessive where plaintiff's symptoms included headaches, sleeplessness, and frequent crying); *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1062 (8th Cir.1993) (damages of $125,000 for past emotional distress and $25,000 for future emotional distress from discriminatory discharge not excessive); *see also Ruiz v. Gonzalez Caraballo*, 929 F.2d 31, 34 (1st Cir.1991) ("[T]ranslating legal damage into money damages—especially in cases which involve few significant items of measurable economic loss—is a matter peculiarly within a jury's ken.") (quotation marks omitted).

In sum, I do not believe that Curry could only recover damages which accrued after November 7, 1995. Even if I did, however, I would still find the jury's verdict a sustainable and reasonable one.

For these reasons, I would affirm the district court's decision in its entirety and I concur in the decision not to require remittitur of the jury verdict.

RANDOLPH, Circuit Judge, concurring:

I join all of Judge Henderson's opinion except for Part II–B. For the reasons given by Judge Wald regarding the period after October 1995, I agree that the jury's award of $100,000 must be sustained.