**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 12 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

LILLIAN RUBIDOUX and DANA
WISTHOFF,

      Plaintiffs-Appellees,

v.

COLORADO MENTAL HEALTH
INSTITUTE AT PUEBLO and STATE
OF COLORADO,

      Defendants-Appellants.

No. 97-1379

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 94-WM-202)

---

Submitted on the briefs:[*]

Gale A. Norton, Attorney General, and Douglas J. Cox, Assistant Attorney General,
Denver, Colorado, for Defendants-Appellants.

J. E. Losavio, Max Addison Wilson, and William J. Culver, Pueblo, Colorado, for
Plaintiffs-Appellees.

---

Before **SEYMOUR**, Chief Judge; and **PORFILIO** and **KELLY**, Circuit Judges.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The cause therefore is ordered
submitted without oral argument.

**PORFILIO**, Circuit Judge.

Colorado Mental Health Institute at Pueblo (CMHIP) appeals the district court's order awarding damages of $23,000 to Lillian Rubidoux and $19,000 to Dana Wisthoff on their claims of discrimination based on quid pro quo and a hostile work environment in violation of Title VII. Our analysis leads to the conclusion this appeal is controlled by *Burlington Industries, Inc. v. Ellerth*, ___ U.S. ___, 118 S. Ct. 2257 (1998), and *Faragher v. City of Boca Raton*, ___ U.S. ___, 118 S. Ct. 2275 (1998), both decided by the Supreme Court after this case was tried. These decisions require reversal of the judgment.

CMHIP hired Ms. Rubidoux in 1989 as an entry-level registered nurse (Nurse IA) and Ms. Wisthoff in 1991 as a psychiatric technician to work in the Child and Adolescent Treatment Center (CATC) of CMHIP. CATC was divided into five residential treatment units called "Cottages," and both plaintiffs were assigned to Cottage A where Leonard Jimenez was lead nurse. Although Jimenez could not alone make hiring and firing decisions, he interviewed both plaintiffs, and his recommendation was "quite possibly" the sole basis for their hiring, according to Division Director Dr. Kailish Jaitly. Jimenez set schedules, granted leave, conducted performance reviews, and could initiate hearings

to formally consider employee performance. In its factual findings, the district court stated, "Jimenez used that actual or apparent authority to sexually harass the Plaintiffs."

Both women reported similar incidents in which Jimenez, weighing over 200 pounds, grabbed their faces and forcefully kissed them on the mouth; ordered them to isolated places in the cottage or on the grounds for some ostensible work assignment and used the isolation to grab their breasts, buttocks, and press himself against them. He also asked both to stay after work to discuss some problem and used the meeting to pry into personal matters, comment on their appearance, and hug or touch them upon departing. In each incident, plaintiffs told Jimenez to stop or not to touch them.

In Ms. Rubidoux's case, although a Nurse IA is traditionally promoted to Nurse IB within a year, after twenty months Ms. Rubidoux asked Jimenez about her promotion, and he responded, "What's in it for me," if he got her promoted. After her last encounter when he forced her up against an examining table, told her he wanted to do a pelvic examination, and reached under her clothes, she claimed because she rejected his advances, Jimenez subjected her to demeaning and humiliating treatment in front of the other Cottage A employees, calling her a "pendeja" (stupid woman), and telling her she needed to go to obedience school.

When Ms. Wisthoff was hired, Jimenez stated she "could be fired for anything," and his advances promptly began. In a final incident, Jimenez asked Ms. Wisthoff to

come into his office to discuss her recent divorce. Instead, he groped her, and she screamed and slapped Jimenez to make him release her.

Although neither plaintiff reported these incidents, another female employee filed a complaint about similar actions taken by Jimenez against her. CMHIP representatives immediately suspended Jimenez, investigated, and ultimately discharged him. The district court specifically found the complaint by this employee was the only official complaint, and none of the victims was aware of the others' experiences until after CMHIP began the investigation.

Based on these facts, the district court concluded plaintiffs made the threshold showing of "hostile work environment sexual harassment that each was subjected to unwanted sexual conduct by her supervisor" which unreasonably interfered with her work. The court relied principally on *Meritor Savings Bank, FSB v. Vincent*, 477 U.S. 57, 65 (1986), the law of this circuit, *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1418 (10th Cir. 1987), and the Restatement (Second) of Agency § 219, and held CMHIP liable for "acts where the employee purported to act or speak on behalf of the principal and there was reliance on that apparent authority or the employee was aided in the act by the existence of the agency relation." The court expanded the conclusion, relying on *Sauers v. Salt Lake County*, 1 F.3d 1122 (10th Cir. 1993) (Secretary in County Attorney's Office failed to prove hostile environment sexual harassment or quid pro quo in her transfer), by stating "if the harassing supervisor had significant control over the victim's

- 4 -

hiring, firing or conditions of employment, the employer could be liable regardless of its actual or constructive knowledge of the supervisor's conduct." The district court believed this result was supported by *Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437 (10th Cir. 1997), and *Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir. 1994). It further concluded liability attached even though higher management did not have notice and Jimenez was not part of higher management. Instead, the court held the supervisor's actual or apparent authority to control the victim's working environment and aid in harassing the victim established employer liability.

Moreover, the court concluded plaintiffs prevailed on their quid pro quo claims by showing a concrete employment benefit or avoidance of adverse consequences was conditioned on their submission to their supervisor's sexual demands. This conclusion was posited on the court's factual finding Jimenez had actual or apparent authority to affect the terms and conditions of their employment and used the authority in a quid pro quo fashion.

The question before us, then, is whether the district court applied the correct standard for determining the vicarious liability of the employer. The issue, as we have noted, is resolved by *Faragher* and *Burlington Industries*.

In *Faragher*, the Court sought to identify "the circumstances under which an employer may be held liable under Title VII ... for the acts of a supervisory employee whose sexual harassment of subordinates has created a hostile work environment

amounting to employment discrimination." 118 S. Ct. at 2280. The Court held "an employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of a plaintiff victim." *Id.*

Plaintiff Faragher, then a college student, was a lifeguard employed by the City of Boca Raton. Two of her three immediate supervisors harassed her repeatedly, touching, using foul language and gestures, and making clear she was useful only as a sexual object. Although it was undisputed the City had adopted a sexual harassment policy at this time, the policy was not delivered to marine safety, the section in which the plaintiff was employed, and the supervisors were unaware of its contents.

Nonetheless, Ms. Faragher and other female lifeguards informally complained about the harassment to one supervisor for whom they had high esteem. Although this supervisor listened, he did not report the complaints to his supervisor because he did not believe it was "his place" to do so. Indeed, he responded to one of the complainants, "the City just doesn't care." *Id.* at 2281.

Nonetheless, another female lifeguard formally complained about the conduct of the offending supervisors. Thereafter, the City investigated and reprimanded them, making them choose between suspension without pay or forfeiture of annual leave.

After examining plaintiff's allegations, the district court concluded Faragher's supervisors' conduct was "discriminatory harassment sufficiently serious to alter the

conditions of [her] employment and constitute an abusive working environment." *Id.*
The district court then ruled the City was liable under traditional agency principles
because the supervisors were its agents when they committed the harassing acts; and it
imputed the third supervisor's knowledge and inaction to the City as another basis for
finding liability. Ultimately, the Eleventh Circuit reversed, holding the City lacked
constructive knowledge and the trial court overly broadened traditional agency principles.
*Faragher v. City of Boca Raton*, 111 F.3d 1530 (11th Cir. 1997) (en banc).

The Supreme Court disagreed and reversed, framing its review with § 219 of the
Restatement,[1] noting that "[t]he proper analysis here, then, calls not for a mechanical
application of indefinite and malleable factors set forth in the Restatement ... but rather an
inquiry into the reasons that would support a conclusion that harassing behavior ought to
be held within the scope of a supervisor's employment, and the reasons for the opposite
view." 118 S. Ct. at 2288. The ultimate question is "whether or not it is just that the loss
resulting from the servant's acts should be considered as one of the normal risks to be
borne by the business in which the servant is employed." *Id.* The facts of the case before
it led the Court to observe, given the "persistent problem" of hostile environment sexual
harassment by supervisors, "[a]n employer can, in a general sense, reasonably anticipate
the possibility of such conduct occurring in its workplace, and one might justify the

---

[1]Section 219(1) states the central principle of agency law:
 A master is subject to liability for the torts of his servants committed while
 acting in the scope of their employment.

assignment of the burden of the untoward behavior to the employer as one of the costs of doing business, to be charged to the enterprise rather than the victim." *Id.* Nonetheless, the Court noted this view conflicts with the presumption Congress would not want courts to ignore the traditional agency distinction between acts falling within the scope of employment and notions of "frolic and detour" which play a prominent role in determining the vicarious liability of employers. Yet, the Court continued, favoring the innocent employee is supported by "the fairness of requiring the employer to bear the burden of foreseeable social behavior ...." *Id.* at 2289. Given this approach, the Court summarized, "there are good reasons for vicarious liability for misuse of supervisory authority." *Id.* at 2291.

To square that position with the traditional agency approach of *Meritor,* the Court offered two basic alternatives: one "to require proof of some affirmative invocation of that authority by the harassing supervisor, the other to recognize an affirmative defense to liability in some circumstances ...." *Id.* The employer's defense would be, for example, to "have provided a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense." *Id.* at 2292.

Thus, the Court held:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative

defense to liability or damages, subject to proof by a preponderance of the evidence .... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Id.* at 2292-93. The Court, however, reiterated that no affirmative defense could overcome an employer's tangible employment action. Further, it recognized that raising the defenses was not necessary in all cases. Also, in reversing the Eleventh Circuit, the Court reemphasized the district court's findings on the degree of hostility and unchecked authority as well as plaintiff's "complete isolation" from the City's higher management which rose to an actionable level. While the City could present its affirmative defense, the Court noted the unchallenged factual findings of the district court that the City's policy was not disseminated to marine safety employees. It observed the Court of Appeals' "indulgent gloss on the relevant evidence," and concluded as a matter of law "the City could not be found to have exercised reasonable care to prevent the supervisors' harassing conduct." *Id.* at 2293.

In ***Burlington Industries***, the Court clarified that "quid pro quo" and "environmental" sexual harassment paradigms that have been developed in Title VII litigation do not define the nature or extent of an employer's liability. 118 S. Ct. at 2264. Indeed, the terms serve only to distinguish between explicit or constructive alterations in the terms of employment within the context of Title VII. *Id.*

In that case, plaintiff quit her job, later explaining that her supervisor's constant sexual harassment forced her to leave. The district court granted the employer summary judgment, and the Seventh Circuit reversed, offering eight separate opinions. The question presented before the Court was:

> Whether a claim of quid pro quo sexual harassment may be stated under Title VII ... where the plaintiff employee has neither submitted to the sexual advances of the alleged harasser nor suffered any tangible effects on the compensation, terms, conditions or privileges of employment as a consequence of a refusal to submit to those advances.

The Court premised its analysis by reiterating that agency factors, as discussed in *Faragher*, "and not the categories quid pro quo and hostile work environment, will be controlling on the issue of vicarious liability." *Id.* at 2265.

Arising from that agency relationship, the Court stated, was the possibility of a supervisor's making a tangible employment decision; that is, transferring, docking pay, or firing, all actions which an harassing co-worker cannot do. "Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates ... [and] requires an official act of the enterprise, a company act." *Id.* at 2269. The Court observed that confusion among courts has been caused by the tension between the possibility of a supervisor's conduct being invested with even more menacing characteristics by virtue of the agency relationship and the possibility the supervisor could commit the same harassing acts as a co-employee, where his status makes no difference. The Court reiterated that *Meritor's* analysis suggesting limitation of

employer liability based on agency principles remained viable in the face of the evolving "aided in the agency relation standard" and Title VII's clear call to encourage the creation of antiharassment policies and effective grievance mechanisms. *Id.* at 2270. The Court then reached the same conclusion as that expressed in ***Faragher*** and remanded to give the plaintiff an opportunity to amend her pleadings or supplement her discovery in light of its discussion of the quid pro quo hostile environment labels.

Plaintiffs attempt to avoid reversal here by arguing CMHIP fully litigated its affirmative defenses, and the district court found its allegations of a model policy and other attempts to meet the employer's responsibility under Title VII refuted by spotty and ineffective application. They also note the testimony from at least two witnesses that when sexual assaults were reported, no action was taken. Plaintiffs point out after Jimenez's final state hearing, the administrative law judge found that Jimenez deterred women from making complaints, encouraged physical contact between himself and the staff, and permitted vulgar and obscene jokes. The plaintiffs also cite the testimony of a team leader of Cottage A who, in March 1993, told Jimenez the sexual joking was inappropriate. Although Jimenez was again warned about the offensive atmosphere, no corrective action was taken.

Plaintiffs concede the district court used the wrong standard in deciding quid pro quo sexual harassment after ***Burlington***, but urged the question remains whether "application of this new standard makes the findings of the District Court clearly

erroneous requiring remand to the District Court for additional findings consistent with the new rulings," citing *Quezada v. County of Bernallo*, 944 F.2d 710, 717 (10th Cir. 1991). Yet, the test is not whether the "new standard" makes the district court's *findings* erroneous, but whether the district court found defendant's vicarious liability upon the correct *legal standard*. In that light, because it is evident the court applied a strict liability standard without consideration of the employer's affirmative defenses, we believe both *Faragher* and *Burlington* require reversal.

The judgment of the district court is **REVERSED**, and the matter is **REMANDED** for further proceedings.