F I L E D
**United States Court of Appeals
Tenth Circuit**

**MAR 24 2000**

**PATRICK FISHER**
Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GENEVA COKER,

     Plaintiff-Appellant,

v.

BALL JANITOR SERVICE, INC., an
Oklahoma Corporation d/b/a Ball
Environmental Maintenance Service,
Inc.; SHANNON BALL, individually
and as agent for Ball Janitor Service,
Inc.,

     Defendants-Appellees.

No. 99-5099

(D.C. No. 98-CV-200-K)
(N.D.Okla.)

---

**ORDER AND JUDGMENT** *

---

Before **BRISCOE, ANDERSON,** and **LUCERO** , Circuit Judges .

---

     Plaintiff Geneva Coker appeals from the district court's grant of summary

judgment in favor of defendants Ball Janitor Service, Inc. (BJSI) and Shannon

Ball (Ball) on Coker's Title VII-based claims for sexual harassment. Plaintiff

also appeals from the district court's denial of her motion to alter or amend

---

     * This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

judgment. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

BJSI is an Oklahoma corporation doing business within the State of Oklahoma. Plaintiff Coker began working as a janitor for BJSI on February 11, 1981. From that point until her departure on March 20, 1997, Coker worked the third shift (11 p.m. to 7 a.m.) for BJSI, performing cleaning services at the Tulsa International Airport.

In January 1990, defendant Ball, the son of co-owner Melvin Ball and the nephew of co-owner Brad Ball, became the third-shift supervisor. At the time, Ball was approximately twenty-one years old and plaintiff was approximately fifty years old. Shortly after Ball became the third-shift supervisor, plaintiff asked him if he could give her a ride home from work. Ball agreed. It is uncontroverted that plaintiff and Ball engaged in a sexual encounter during that car ride. The parties differ, however, on the chain of events that precipitated the encounter. Plaintiff alleges that during the ride she offered to do Ball a favor in return for giving her a ride. In response, plaintiff alleges, Ball told her he wanted to "trade out," and proceeded to unzip his pants and pull out his penis. Plaintiff further alleges that he asked her to "to play with" his penis, and she complied. Id. at 96-97. Although plaintiff alleges Ball told her never to tell anyone about the incident, she admits she never indicated to him that his conduct was unwelcome

2

or inappropriate.

Ball's memory of the incident varies in several respects. He alleges that during the ride, plaintiff initiated a long conversation with him concerning sexual matters. He further alleges that, at some point during the conversation, plaintiff indicated she would masturbate him. Accordingly, he alleges, he unzipped his pants, removed his penis, and plaintiff masturbated him. Afterwards, he took plaintiff home.

It is uncontroverted that from the time of this initial encounter in January 1990 until plaintiff's departure from employment with BJSI in March 1997, plaintiff and Ball engaged in numerous sexual encounters in the workplace and on the way home after work. In Ball's estimation, he and plaintiff had more than forty sexual encounters between 1990 and 1997. Plaintiff, on the other hand, contends that Ball initiated sexual encounters with her at least once a week, and sometimes twice a week, during the entire period between 1990 and 1997.

According to plaintiff, she engaged in the sexual encounters with Ball because he was her boss and she "was afraid [she] would lose [her] job." Id. at 106. It is uncontroverted, however, that he never told her she would lose her job or suffer any other adverse job consequences if she rejected his sexual advances. It is further uncontroverted that at no time did plaintiff tell Ball that she did not want to engage in sexual encounters with him, nor did she do anything to let him

3

know that his sexual advances were unwelcome. In fact, plaintiff admitted that she regularly asked Ball for a ride home from work when her car did not work, even though she knew he might initiate a sexual encounter with her. Plaintiff never complained to anyone at BJSI about the situation (she alleges she believed her complaints would be ignored by BJSI's human resource manager, as well as by the co-owners of BJSI, who were Ball's relatives). Plaintiff never requested a transfer to another shift, nor did she look for other jobs during the period between 1990 and 1997. Finally, plaintiff gave conflicting statements regarding if and when she experienced any emotional distress as a result of the alleged harassment.

The parties agree that plaintiff's last day of employment with BJSI was March 20, 1997, but they disagree on the details of her departure. According to defendants, plaintiff had been spreading rumors in the workplace about Ball having a sexual relationship with another BJSI employee. In response, Ball allegedly told plaintiff that, unless she ceased doing so, she would need to move to another shift or find another job. Plaintiff allegedly became upset in response to Ball's statements. Ball then took plaintiff's security badge (which was necessary for entry into the airport) and asked her to leave and speak with him when she calmed down. Plaintiff allegedly refused to leave until her shift had ended. Upon completion of her shift, plaintiff met with Ball and BJSI co-owner Melvin Ball. During the meeting, Melvin Ball allegedly offered to move plaintiff

4

to another shift. After leaving the meeting, plaintiff encountered co-owner Brad Ball, who allegedly admonished her for spreading rumors and told her she should move to another shift or a different work area so that she and Ball would not have to work together anymore. According to defendants, plaintiff never returned to work for BJSI after March 20, 1997. Defendants further point out that in her EEOC charge, plaintiff alleged that she quit her job with BJSI. App. at 133 ("I resigned on March 20, 1997.").

In contrast to defendants' version, plaintiff alleges that on the morning of March 20, 1997, Ball approached her at work and told her she needed to accompany him to the office (it is unclear from her deposition to what specific office she was referring). Plaintiff allegedly refused to accompany him, and, in response, he allegedly grabbed her arms and attempted to pull her to the office. Ultimately, plaintiff alleges, he took her security badge from her and informed her she was fired. Plaintiff acknowledges, however, that she continued to work until the end of her shift. Plaintiff further acknowledges that she had a conversation with Ball and Melvin Ball after the end of her shift.

After filing a charge of discrimination with the EEOC, plaintiff filed this action alleging claims of quid pro quo harassment and hostile work environment harassment under Title VII, as well as state law claims for intentional interference with a business relationship, intentional infliction of emotional distress, assault

5

and battery, and negligent supervision and retention. Pursuant to defendants' motion, the district court granted summary judgment in favor of defendants with respect to plaintiff's Title VII claims, and dismissed the remaining state law claims without prejudice. Plaintiff's motion to alter or amend judgment was denied by the district court.

## II.

On appeal, plaintiff contends the district court erred in granting defendants' motion for summary judgment, and in denying her subsequent motion to alter or amend judgment. We review de novo the district court's grant of summary judgment, applying the same standard as the district court under Fed. R. Civ. P. 56(c). See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.), cert. denied, 120 S. Ct. 53 (1999). Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When reviewing a grant of summary judgment, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. Simms, 165 F.3d at 1326. As for the district court's denial of plaintiff's motion to alter or amend judgment, we apply an abuse of discretion standard. See Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997).

## III.

Plaintiff's complaint, which was filed prior to the Supreme Court's decision in Burlington Industries, Inc. v. Ellerth, 118 S. Ct. 2257 (1998), asserted distinct claims of quid pro quo and hostile work environment sexual harassment. Presumably, plaintiff did so because, at the time her complaint was filed, "[t]he standard of employer responsibility turned on which type of harassment occurred." Id. at 2264. If a plaintiff was able to establish a claim of quid pro quo harassment, the federal courts generally held "the employer was subject to vicarious liability." Id. Not surprisingly, this "rule encouraged Title VII plaintiffs to state their claims as quid pro quo claims, which in turn put expansive pressure on the definition" of what constituted quid pro quo harassment. Id. at 2265.

In Ellerth, the Court downplayed the distinctions between these two court-created categories of harassment. In particular, the Court rejected the notion that "the categories quid pro quo and hostile work environment" are "controlling on the issue of [an employer's] vicarious liability." Id. Instead, the Court indicated, these categories are helpful only for purposes of determining whether a plaintiff can prove she was subjected to discrimination:

> To the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general, the terms [quid pro quo and hostile work environment] are relevant when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII. When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a

7

supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII. For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive.

Id.

Acknowledging the Court's decision in Ellerth, we review plaintiff's quid pro quo and hostile work environment claims separately for purposes of determining whether plaintiff presented sufficient evidence to survive summary judgment on her Title VII claims.

*Plaintiff's quid pro quo claim*

As previously noted, a plaintiff can demonstrate she was subjected to actionable discrimination under Title VII by demonstrating "that a tangible employment action resulted from [her] refusal to submit to a supervisor's sexual demands." Ellerth, 118 S. Ct. at 2265. "A defendant-employer may refute such a claim of *quid pro quo* harassment in either of two ways: with proof that no negative employment action was taken, i.e., that the employee resigned, for example; or by establishing that the decision to terminate was made for legitimate business reasons and not because the employee refused to submit to sexual demands." Smith v. Cashland, Inc., 193 F.3d 1158, 1160 (10th Cir. 1999).

Relying exclusively on pre-Ellerth definitions of quid pro quo harassment,

plaintiff suggests it is unnecessary for her to demonstrate either that she refused to submit to her supervisor's alleged sexual demands, or that a tangible employment action resulted from any such refusal. Instead, plaintiff suggests, she need demonstrate only that the terms of her employment were conditioned upon her submitting to her supervisor's sexual demands. Although plaintiff is correct to the extent that submission to unwelcome sexual demands does not preclude a plaintiff from prevailing under Title VII, it is clear, under Ellerth, that quid pro quo harassment will be found to have occurred only when a tangible employment action is taken in response to a victim's refusal to submit to her supervisor's sexual advances. 118 S. Ct. at 2265. Otherwise, a plaintiff must demonstrate she was subjected to a hostile working environment which constructively altered the terms or conditions of her employment. See id.; see also Curry v. District of Columbia, 195 F.3d 654, 659 (D.C. Cir. 1999) (noting that quid pro quo harassment constitutes an explicit alteration of the terms or conditions of employment, whereas a hostile working environment constitutes a constructive alteration of the term or conditions of employment); Rubidoux v. Colorado Mental Health Inst., 173 F.3d 1291, 1295 (10th Cir. 1999) (noting the terms quid pro quo and hostile environment "serve only to distinguish between explicit or constructive alterations to the terms or conditions of employment").

In passing, plaintiff alleges a tangible employment action occurred in that

she was terminated from her employment with BJSI. There are two significant problems with this allegation. First, the great weight of the evidence in the record on appeal suggests plaintiff was not terminated, but instead voluntarily resigned from her employment with BJSI. In particular, plaintiff's account of the alleged termination is nearly incomprehensible, and she admitted in her EEOC charge that she resigned. Thus, we are not persuaded a rational jury could conclude, based upon the evidence contained in the record, that she was terminated. Second, even assuming plaintiff has presented sufficient evidence to demonstrate that her employment was terminated, she has failed to present any evidence demonstrating that the termination was the result of her failure to submit to Ball's sexual advances. Indeed, the evidence demonstrates that plaintiff submitted to most or all of Ball's sexual advances, and there is no evidence that the alleged termination was precipitated by a spurned sexual advance.[1]

For these reasons, we conclude the district court properly granted summary judgment in favor of defendants with respect to plaintiff's quid pro quo theory of sexual harassment.

---

[1] Although plaintiff could perhaps argue that one could infer Ball was intending to make a sexual advance when he asked her to accompany him to his office on March 20, 1997, there is no indication in the record that plaintiff personally believed this to be the case. Nor is there any evidence that plaintiff refused to accompany him to the office because she did not want to engage in any sexual conduct with him.

*Plaintiff's hostile work environment claim*

Plaintiff can establish actionable sexual harassment under Title VII if she demonstrates she was subjected to a hostile work environment so severe or pervasive that it constructively altered the terms or conditions of her employment. See Ellerth, 118 S. Ct. at 2265; Harris v. Forklift Systems, Inc., 510 U.S. 17, 20 (1993); Curry, 195 F.3d at 659. In order to survive summary judgment, plaintiff must produce sufficient evidence to allow a rational jury to find that (1) the alleged harassing conduct was severe or pervasive enough to create an objectively hostile or abusive work environment, and (2) plaintiff subjectively perceived the environment to be abusive. See Harris, 510 U.S. at 21; Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1412 (10th Cir. 1997).

Analyzing these requirements in reverse order, we focus first on the evidence pertaining to plaintiff's subjective perception of her working environment. Plaintiff alleges that Ball made sexual advances toward her on a weekly or twice-weekly basis from January 1990 through March 1997. Plaintiff admits that she acquiesced most, if not all, of the time, and did not do or say anything to Ball to let him know his advances were unwelcome. Further, plaintiff admitted that, during the seven-year course of this alleged conduct, she routinely asked Ball to give her rides home from work, knowing that he might make a sexual advance toward her. Lastly, plaintiff admitted that she told no one about

11

the alleged harassment, did not ask to be moved to a different shift, and made no attempt to look for another job. Taken together, this evidence strongly suggests plaintiff did not subjectively perceive her working environment to be abusive.

The only evidence indicating that plaintiff subjectively perceived Ball's conduct to be harassing and abusive comes from her deposition and subsequently prepared affidavit. During her deposition, plaintiff was asked by defense counsel "what [her] feelings [we]re about Shannon Ball and the relationship [she] had with him." App. at 103. In response, plaintiff said, "Well, I don't have feelings about that." Id. Defense counsel followed up by asking, "Are you claiming that you have suffered emotional distress as a result of your relationship with Shannon Ball?" Id. Plaintiff responded "No." Id. Later in the deposition, the following colloquy occurred between defense counsel and plaintiff:

Q. How would you describe your state of mind right now? I mean, how are you getting along?

A. I guess emotionally distressed right now.

Q. Well, ma'am, I thought you told me earlier in the deposition that you were not claiming emotional distress?

A. I didn't quite get your –

Q. You have a better understanding of what emotional distress means now?

A. Yes.

Q. What does emotional distress mean to you?

12

A. I just get upset every time I have to talk about this.

Q. Well, when did you first start getting upset about it?

A. The morning that Shannon [Ball] told me I was fired.

Id. at 116-17. Later in the deposition, plaintiff indicated that she was, in fact, claiming emotional distress as a result of Ball's alleged conduct. Id. at 200. In particular, plaintiff indicated that she had experienced "[e]mbarrassment," "hurt," and "pain." Id. When asked by defense counsel when she first began to experience these emotions, plaintiff again responded: "The morning that Shannon [Ball] fired me." Id. Finally, upon subsequent questioning by defense counsel, plaintiff stated that she began experiencing anger and worry about losing her job in January of 1990. Id. at 203. After her deposition was transcribed, plaintiff submitted written corrections indicating she meant to say that she began experiencing emotional distress "The day Shannon began sexually harassing me," rather than "The morning that Shannon fired me." Id. at 201. Four months after her deposition was taken, plaintiff signed an affidavit stating: "The sexual demands placed on me by Shannon Ball were both unwelcome and offensive." Id. at 254.

Viewing this latter evidence in the light most favorable to the plaintiff, we are unable to conclude that a rational jury could reasonably find in favor of plaintiff on the subjective perception issue. To the contrary, we conclude a

13

rational jury could find only that plaintiff engaged in a consensual sexual relationship with Ball.

Even assuming, *arguendo*, that plaintiff's deposition testimony and affidavit are sufficient to create a genuine issue of material fact concerning whether she subjectively perceived the working environment to be abusive, she has failed to present sufficient evidence to demonstrate that her working environment was objectively hostile. Although a supervisor making 350-700 sexual advances over a seven-year period would clearly be considered objectively hostile if the subordinate at some point took some type of action to indicate the advances were unwelcome (e.g., refusing to engage in the proposed sexual conduct), it is uncontroverted in this case that plaintiff literally did and said nothing to indicate to Ball that his advances were unwelcome. To the contrary, plaintiff admits that she engaged in sexual relations with Ball upon each request. Because Ball's sexual advances met with approval on each occasion, we are not persuaded that a jury could conclude plaintiff's working environment was objectively hostile.

For these reasons, we conclude the district court properly granted summary judgment in favor of defendants with respect to plaintiff's hostile work environment claim.

14

*Denial of motion to alter or amend judgment*

Because plaintiff failed to produce sufficient evidence to survive summary judgment on her Title VII claims, we find no basis for concluding the district court abused its discretion in denying plaintiff's motion to alter or amend judgment. Indeed, plaintiff's motion to alter or amend judgment was little more than a rehash of her response to the defendants' summary judgment motion.

IV.

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge