Jacqueline J. RAYMOND, Plaintiff,

v.

**U.S. CAPITOL POLICE BOARD,**
Defendant.

Civil Action No. 00–903(RMU).

United States District Court,
District of Columbia.

July 26, 2001.

Karl Carter, Washington, DC, for plaintiff.

Claudia A. Kostel, Senate Senior Counsel for Employment, Office of the Senate Chief Counsel for Employment, Washington, DC, for defendant.

*MEMORANDUM OPINION*

URBINA, District Judge.

GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This civil-rights matter comes before the court on the defendant's motion for summary judgment. The plaintiff, Jacqueline J. Raymond ("the plaintiff" or "Ms. Raymond"), brings this employment-discrimination case under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–16, and the Congressional Accountability Act, 2 U.S.C. § 1301 *et seq.*[1] Ms. Raymond alleges that: (1) the United States Capitol Police Board ("the defendant" or "the Capitol Police Board") discriminated against her on the basis of her race; (2) the defendant created a hostile-work environment; and (3) the defendant retaliated against her for making allegations of racial discrimination.

Specifically, Ms. Raymond claims that the defendant issued parking tickets to African–American officers, including her, but not to white officers who were parked in similar locations without permits. She also asserts that the Capitol Police Board failed to discipline a fellow officer who called her a "bitch." Lastly, Ms. Raymond claims that as a result of her allegations of racial discrimination, the Capitol Police Board retaliated by withholding her paycheck while she was on sick leave and by forcing her into retirement.

The defendant now moves for summary judgment, arguing that the plaintiff cannot establish a prima-facie case of discrimina-

---

1. In her complaint, the plaintiff asserts a cause of action under the Government Employees Rights Act, 2 U.S.C. § 1202(1), and bases jurisdiction in part on 2 U.S.C. § 1301. *See* Fourth Am. Complaint ("Compl.") at 1, 2. In subsequent filings, however, the plaintiff does not discuss section 1202(1). Rather, she discusses 2 U.S.C. § 1301(9)(D). *See* Opp'n to Mot. to Dis. at 1. In addition, the defendant only addresses the Congressional Accountability Act in its motion. *See* Mot. for Summ. J. at 1. Therefore, the court will assume that the plaintiff intends to bring this action under the Congressional Accountability Act.

tion, hostile work environment, or retaliation. For the reasons that follow, the court will grant the defendant's motion for summary judgment on all counts.

## II. BACKGROUND

Ms. Raymond is an African–American woman. *See* Fourth Am. Compl. ("Compl.") ¶ 5. She served as a Capitol Police Officer from April 4, 1977 until May 31, 2000, when she reached the Capitol Police's mandatory retirement age of 57. *See* Def.'s Statement of Undisputed Material Facts ("SUMF") at 1. Ms. Raymond received several letters of commendation during her service. *See* Compl. ¶ 6.

On about March 30, 1999, Capitol Police Officer Carroll Arnold, a white male officer, gave Ms. Raymond a ticket for illegally parking in a zone without a permit. *See* Compl. ¶ 7. At Ms. Raymond's request, Capitol Police Sergeant Philip G. Gerber submitted the ticket to the inspector with a recommendation that the ticket be withdrawn, which it later was. *See* Mot. for Summ. J., Ex. 1. On April 5, 1999, Ms. Raymond received a second ticket for parking in the same location without a permit. *See id.*, Ex. 2. Following the same procedure, the ticket was cancelled. *See* Compl. ¶ 9. Sergeant Gerber, however, ordered Ms. Raymond to park in her assigned location. Ms. Raymond complied. *See id.* ¶ 11. She alleges, however, that no white or male officer was given the same order.

At this time, Ms. Raymond told Sergeant Gerber that she thought the tickets were racially motivated. *See* Compl. ¶ 8. Ms. Raymond said she thought that white officers who had parked in the same area were not ticketed. *See id.* The Capitol Police Board says that Sergeant Gerber investigated this claim but concluded that the tickets were not racially motivated. *See* Mot. for Summ. J. at 3.

After the withdrawal of the second ticket, a fellow Capitol Police Officer, Stephen G. McGeown, referred to Ms. Raymond as "that bitch, that bitch, that bitch Jackie Raymond. She is the cause of all of this." *See* Compl. ¶ 10. Ms. Raymond did not hear this remark herself, but learned of it from Officer Arnold L. Fields. *See id.* ¶ 12. The Capitol Police Board does not dispute this incident. *See* Mot. for Summ. J. at 14. The next day, Sergeant Gerber questioned Officer Fields about the incident. *See* Compl. ¶ 13. Sergeant Gerber then disciplined Officer McGeown by deducting eight hours of accrued leave. *See* Mot. for Summ. J., Ex. 6. In addition, at roll call, the inspector announced that the Capitol Police were making efforts to arrange parking spaces for the officers in a garage. *See* Compl. ¶ 14. Sergeant Gerber also denounced the practice of issuing parking tickets to fellow officers. *See id.* The plaintiff alleges that after this speech, she was considered to be a "trouble maker" and was ostracized by her colleagues. *See id.* Ms. Raymond was unable to complete her shift that day, and Sergeant Gerber gave her permission to go home. *See id.* ¶ 15.

The next day, Sergeant Gerber called Ms. Raymond at home to try to convince her to return to work. *See* SUMF at 5. In addition, Sergeant Gerber offered to assist Ms. Raymond with the harassment problem by scheduling an appointment with a House of Representatives Employee Assistance Program counselor. *See id.* at 4–5. Ms. Raymond, however, never returned to work. *See id.* at 6. Ms. Raymond took stress-related leave until her mandatory-retirement date. *See* Compl. ¶ 28.

Ms. Raymond claims that the Capitol Police Board withheld her paycheck while she was on sick leave from May 1999 until May 2000. *See* Compl. ¶ 28. The Capitol Police Board responds that Ms. Raymond

was compensated through sick leave funds and workers' compensation until her mandatory retirement in May 2000. *See* Mot. for Summ. J. at 6.

After the parties unsuccessfully tried to mediate, Ms. Raymond filed a complaint in the United States District Court on April 25, 2000. The defendant filed a motion to dismiss on June 26, 2000. The plaintiff then submitted her first amended complaint.[2] Thereafter, the plaintiff submitted a third and fourth amended complaint.[3] On March 13, 2001, the defendant moved for summary judgment. To date, no discovery has taken place.

## III. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine what facts are "material," a court must look to the substantive law on which each claim rests. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense, and therefore, affect the outcome of the action. *See Celotex,* 477 U.S. at 322, 106

S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. All evidence and the inferences drawn therefrom must be considered in the light most favorable to the nonmoving party. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the ultimate burden of proof at trial." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *See id.*

### 1. Pre–Discovery Summary Judgment

A party against whom a claim is alleged may move for summary judgment at any time. *See* FED. R. CIV. P. 56(b). In *Celotex,* the Supreme Court explained that there must be "adequate time for discovery" to determine whether summary judgment is appropriate. *See* 477 U.S. at 322, 106 S.Ct. 2548. If there is insufficient evidence indicating that a jury could return a favorable verdict for the nonmoving party, however, then summary judgment is

---

2. The plaintiff's filings are riddled with misspelled words and grammatical errors. For example, the Plaintiff's Opposition to the Defendant's Motion to Dismiss or in the Alternative for Summary Judgment repeats the same sentence twice in a row. *See* Pl.'s Opp'n at 12. In another instance, the Opposition reads: "In the instant case while Defendant did nor misrepresent any facts to her they

initiated her retirement without her knowelege [sic] or [sic] r [sic] consent." *Id.* at 23. While the court recognizes that counsel may have many demands on their time, such sloppy work is disrespectful to the court, and, more importantly, to their client.

3. The plaintiff mislabeled the second amended complaint as the third amended complaint.

proper. *See National Geographic Soc'y v. International Media Assoc., Inc.,* 732 F.Supp. 4, 4 (D.D.C.1990).

Appellate courts disagree on the meaning of "adequate time for discovery" and, more specifically, whether pre-discovery summary-judgment motions are necessarily premature. Some circuits hold that discovery does not have to be complete to grant a motion for summary judgment. *See Alholm v. American Steamship Co.,* 144 F.3d 1172, 1176–1177 (8th Cir.1998) (the district court did not abuse its discretion by hearing a motion for summary judgment before discovery was scheduled to end, because the plaintiff did not move for a continuance and had "ample opportunity" to secure the information he sought prior to the hearing on the motion); *see also Brill v. Lante Corp.,* 119 F.3d 1266, 1275 (7th Cir.1997) (holding that a motion for summary judgment made before discovery has ended is appropriate in the absence of a genuine issue of material fact). Other courts reserve pre-discovery summary judgment for exceptional circumstances. *See Patton v. General Signal Corp.,* 984 F.Supp. 666, 669 (W.D.N.Y. 1997).

In this case, the parties have not begun discovery. Based on the complaint and the plaintiff's affidavits in opposition to the motion for summary judgment, however, the plaintiff fails to present any genuine issues of material fact. Even if given the opportunity to conduct discovery, the plaintiff would not be able to establish a prima-facie case for any of her claims. Accordingly, this case falls into the unusual category in which the court will grant the defendant's motion for summary judgment before any discovery has begun.

## B. Analysis

### 1. Count I: Discrimination on the Basis of Race

The plaintiff alleges that she was discriminated against based on her race. Specifically, she claims that other Capitol Police officers issued parking tickets only to African–American officers. *See* Compl. ¶¶ 19–20. The defendant argues that the plaintiff has not suffered an adverse employment action and, therefore, cannot establish a prima-facie case of racial discrimination. *See* Mot. for Summ. J. at 9.

■■■ Under the *McDonnell Douglas* framework, the plaintiff has the burden of proving by a preponderance of the evidence a prima-facie case of discrimination.[4] The plaintiff must establish that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) similarly situated employees not within the same class were not subjected to the same action by the employer. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1288 (D.C.Cir.1998) (*en banc*). If the plaintiff succeeds in making a prima-facie case, the burden then shifts

---

4. The *McDonnell Douglas* framework requires the following:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817 (citations omitted)).

to the employer to articulate a non-discriminatory reason for its action. At this stage, the employer's burden is merely one of production. *See Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089. If the employer is successful, the burden shifts back to the plaintiff to show that the defendant's proffered reasons are pretextual and that unlawful discrimination was the actual reason for the action. *See McDonnell Douglas,* 411 U.S. at 802–05, 93 S.Ct. 1817.

■ In this Circuit, however, the plaintiff is not required to set forth the elements of a prima-facie case at the initial pleading stage. *See Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1114 (D.C.Cir.2000). In *Sparrow,* the D.C. Circuit held:

> In sum, we agree with the conclusion reached by Judge Easterbrook in *Bennett[ v. Schmidt,* 153 F.3d 516 (7th Cir. 1998)]: "Because racial discrimination in employment is 'a claim upon which relief can be granted,' ... 'I was turned down for a job because of my race'' is all a complaint has to say" to survive a motion to dismiss under Rule 12(b)(6).

*Id.* at 1115 (citation omitted). As the D.C. Circuit also noted in *Sparrow,* however, a plaintiff can actually plead too much, effectively pleading "himself out of court by alleging facts that render success on the merits impossible." *See id.* at 1116.

### 1. The Parking Tickets Were Not an Adverse Employment Action

■ In determining whether something constitutes an adverse employment action, "[c]ourts applying Title VII have consistently focused on 'ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating ... [and not] interlocutory or intermediate decisions having no immediate effect upon employment decisions.'" *Taylor v. FDIC,* 132 F.3d 753, 764

(D.C.Cir.1997) (quoting *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981)). This court has recognized that "an employee need not be fired, demoted or transferred to make out a case of retaliation." *Gary v. WMATA,* 886 F.Supp. 78, 90 (D.D.C. 1995). An adverse action is not actionable under Title VII, however, unless there is a tangible change in responsibilities or working conditions that constitutes a material employment disadvantage. *See Kilpatrick v. Riley,* 98 F.Supp.2d 9, 21 (D.D.C.2000) (Urbina, J.); *Childers v. Slater,* 44 F.Supp.2d 8, 19 (D.D.C.1999) (Urbina, J.). For example, the D.C. Circuit recently explained that even a lateral transfer may be actionable: "It is not enough to ask whether the transfer was purely lateral. We must also ask if other changes in terms, conditions, or privileges followed from the transfer." *Freedman v. MCI Telecomm. Corp.,* 255 F.3d 840, 843 (D.C.Cir.2001).

■ In this case, the dispute centers on whether the plaintiff is entitled to receive a courtesy. Simply put, the court holds that the failure to receive a courtesy, without more, does not constitute an adverse action under Title VII. In *Bailey v. Henderson,* the court rejected the proposition that a male employee's refusal to transport a female employee in his car to receive medical attention was an actionable adverse employment action. *See Bailey v. Henderson,* 94 F.Supp.2d 68, 73 (D.D.C. 2000). Rather, the court held "discrimination cannot be based on this conduct because the failure to receive a courtesy ... is not an adverse employment action." *Id.*

■ In this case, the plaintiff claims that she was issued parking tickets based on her race. *See* Compl. ¶ 19. The tickets do not constitute an adverse employment action for two reasons: (1) the plaintiff has never contested that she was parked ille-

gally in a zone without a permit, and that the ticket was therefore proper; and (2) upon her request, both tickets were cancelled and the plaintiff was not required to pay the fines. Even the cases relied on by the plaintiff demonstrate that some type of tangible harm must form the basis for an adverse employment action. *See* Pl.'s Opp'n at 14, 15. For example, the plaintiff cites *Brown v. Brody,* 199 F.3d 446, 457 (D.C.Cir.1999), which involved a lateral transfer, for the proposition that "[a plaintiff] does not suffer an actionable injury unless there are some other material adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the Plaintiff suffered objectively tangible harm." Pl.'s Opp'n at 14. She also relies on *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981), which held that "hiring, granting leave, discharging, promoting and compensating" constitute personnel actions. *See* Pl.'s Opp'n at 15.

The facts of this case stand in stark contrast to those in *Brown* and *Page.* Two withdrawn tickets do not amount to tangible harm. The plaintiff was not required to pay these tickets. In addition, the plaintiff does not dispute that the tickets had no effect on the plaintiff's work evaluation.

In sum, even under the liberal pleading standard articulated by the D.C. Circuit in *Sparrow,* the plaintiff has essentially pleaded too much. That is, even assuming all her allegations to be true, she still could not establish an adverse employment action. *See Sparrow,* 216 F.3d at 1116. Accordingly, the court grants the defendant's motion for summary judgment on Count I.

### 2. Count II: Hostile Work Environment

The plaintiff's next claim is that the defendant's failure to discipline Officer McGeown for his derogatory comment, coupled with "continued harassment" from fellow Capitol Police Officers, created a hostile work environment. *See* Compl. ¶ 22. Furthermore, the plaintiff claims that the hostile work environment caused her severe mental distress. *See id.* While the defendant does not dispute this incident, the defendant argues that this single incident does not rise to the level of hostility required for a hostile work environment. *See* Mot. for Summ. J. at 14.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or nation of origin." 42 U.S.C. § 2000e–2(a)(1). "Terms, conditions, or privileges" encompass tangible as well as psychological harm. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In addition, the Supreme Court has held that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quotation omitted).

To establish a claim of a hostile work environment based on race, a plaintiff must demonstrate: "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1081 (3d Cir.1996). To determine

whether a hostile work environment exists, a court must look at the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with the employee's work performance. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Harris,* 510 U.S. at 23, 114 S.Ct. 367. While the plaintiff is not required to plead a prima-facie case of hostile work environment in the complaint, the alleged facts must be able to support such a claim. *See Sparrow,* 216 F.3d at 1114. In addition, the Supreme Court has circumscribed the definition of a hostile work environment so that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (citations omitted).

■ The D.C. Circuit has set forth a standard to evaluate employer liability for co-worker harassment. *See Curry v. District of Columbia,* 195 F.3d 654, 660 (D.C.Cir.1999). Specifically, an employer is liable for co-worker harassment if "the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action." *Id.* This standard applies to co-workers who are not in supervisory positions. *See id.*

■ In this case, the plaintiff has pleaded too many facts, demonstrating the weakness of her hostile work environment claim. *See Sparrow,* 216 F.3d at 1116. The totality of the circumstances indicates the following: there was one isolated, derogatory comment; the plaintiff allegedly received the cold shoulder from other offi-

cers; one day elapsed between the comment and the time the plaintiff left work permanently; and Sergeant Gerber promptly disciplined Officer McGeown. In short, the plaintiff will not be able to show conduct that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." [5] *Harris,* 510 U.S. at 22, 114 S.Ct. 367; *see also Russ v. Van Scoyoc Assoc., Inc.,* 122 F.Supp.2d 29, 32 (D.D.C.2000) (holding that in the absence of physical contact, sexually explicit and offensive comments were insufficient to substantiate a hostile work environment claim).

■ The plaintiff also argues that the defendant failed to discipline Officer McGeown, and therefore violated Title VII. *See* Pl.'s Opp'n at 20. Specifically, the plaintiff alleges that Officer McGeown has a "history of insulting members of the African American race" and therefore, the defendant knew or should have known that Officer McGeown would make a derogatory comment. *See id.* The plaintiff, however, misreads this Circuit's precedent. Even if the defendant should have known of the harassment, the defendant took prompt action to discipline Officer McGeown. *See Curry v. District of Columbia,* 195 F.3d 654, 660 (D.C.Cir.1999) (stating that a defendant is liable for co-worker harassment if the employer knew or should have known of the harassment *and* failed to correct the situation). Specifically, Sergeant Gerber questioned a Capitol Police Officer about the incident the following day. *See* Pl.'s Opp'n at 4–5. Furthermore, the defendant provides a time and attendance sheet for Officer McGeown dated a week after the incident,

---

5. The court agrees that under certain circumstances, a single incident may be sufficiently pervasive and severe to support a hostile work environment claim under Title VII. *See*

*Hodges v. Washington Tennis Serv. Int'l, Inc.,* 870 F.Supp. 386, 388 n. 2 (D.D.C.1994) (rejecting the proposition that a single incident as a matter of law cannot violate Title VII).

which indicates a deduction of eight hours of accrued leave.[6] *See* Mot. for Summ. J., Ex. 6. By promptly disciplining Officer McGeown, the defendant complied with this Circuit's interpretation of what Title VII requires. *See Curry*, 195 F.3d at 660. Considering the defendant's compliance and the demanding standards that the court must apply when examining a claim of hostile work environment, the plaintiff cannot substantiate her claim. *See Faragher*, 524 U.S. at 788, 118 S.Ct. 2275. Accordingly, the court grants the defendant's motion for summary judgment on Count II.

### 3. Count III: Reprisal

Lastly, the plaintiff alleges that the defendant retaliated against her for challenging the parking tickets and for filing a complaint with the Capitol Police Office of Compliance, alleging discrimination and reprisal. *See* Compl. ¶ 24. Specifically, she claims that fellow officers gave her the cold shoulder, and while she was on sick leave, the Capitol Police Board withheld her paycheck and then forced her into retirement. *See id.* ¶ 28; Pl.'s Opp'n at 23. In response, the defendant argues that co-worker ostracism is not an adverse employment action, and, therefore, the plaintiff cannot establish a prima-facie case of reprisal. *See* Mot. for Summ. J. at 20–21. The defendant also maintains that it compensated the plaintiff in accordance with Capitol Police policies, specifically through sick leave funds and workers' compensation. *See id.* at 19. In addition, the defen-

dant notes that the plaintiff was retired as required by statute. *See id.* at 18.

 To establish a retaliation claim under Title VII, a plaintiff must demonstrate that: (1) the plaintiff engaged in protected activity; (2) the plaintiff suffered an adverse personnel action; and (3) a causal link existed between the protected activity and the employment action. *See Jones v. WMATA*, 205 F.3d 428, 433 (D.C.Cir.2000). As discussed above, an adverse employment action is not actionable unless it results in a tangible change in the employee's benefits or working conditions. *See Childers*, 44 F.Supp.2d at 19; *Kilpatrick*, 98 F.Supp.2d at 21.

### a. Co–Worker Ostracism

 The plaintiff alleges that other Capitol Police officers ostracized her for challenging the parking tickets on racial grounds. *See* Compl. ¶ 24. But the defendant correctly counters that co-worker ostracism does not constitute an adverse employment action. *See* Mot. for Summ. J. at 19–21. "The fact that plaintiff believes she was getting the cold shoulder from her co-workers does not constitute a materially adverse consequence or disadvantage in the terms and conditions of her employment so as to establish an adverse personnel action." *Roberts v. Segal Co.*, 125 F.Supp.2d 545, 549 (D.D.C.2000); *accord Brooks v. San Mateo*, 229 F.3d 917, 929 (9th Cir.2000). In this case, the plaintiff left work the same day that the alleged ostracism began. While the court does not diminish the impact of such alleged treat-

---

**6.** While the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true, the court is not required to accept mere unsupported allegations offered in opposition to the motion for summary judgment. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Here, the plaintiff alleges "[t]o the best of my knowledge no disciplinary action was taken

[sic] this white Officer for making these remarks to minority individuals." Pl.'s Opp'n at 19. The defendant, however, provides a record of disciplinary action and the plaintiff has not questioned the authenticity or accuracy of that record. *See* Mot. for Summ. J., Ex. 6. Under these circumstances, the court concludes that plaintiff's claim of failure to discipline is an unsubstantiated allegation.

ment, there was no material change in the conditions of the plaintiff's employment.

### b. Paycheck and Retirement Benefits

Next, the plaintiff claims that the defendant retaliated against her by withholding the plaintiff's paycheck while she was on stress-related sick leave. *See* Compl. ¶¶ 26–28. During this time, however, the plaintiff was compensated through sick leave funds and workers' compensation. *See* Mot. for Summ. J. at 19, Ex. 2–4. Moreover, the plaintiff does not deny that she was compensated through her sick leave and that she was advanced sick-leave time. *See* Pl.'s Opp'n at 21 n. 1. Accordingly, this allegation does not amount to an adverse employment action. *See Childers*, 44 F. Supp .2d at 19.

The plaintiff also charges that the defendant forced her into retirement. Specifically, she claims that she was not notified of her mandatory retirement and that she did not consent to retire. *See* Pl.'s Opp'n at 22. In addition, she says she was not released by her doctor before she was "summarily" retired. *See id.* This claim also lacks support. The Capitol Police Retirement Act mandates retirement when:

> A member of the Capitol Police who is otherwise eligible for immediate retirement under section 8412(d) shall be separated from the service on the last day of the month in which such member becomes 57 years of age or completes 20 years of service if then over that age . . . The Board shall notify the member in writing of the date of separation at least 60 days before that date. Action to separate the member is not effective, without the consent of the member, until the last day of the month in which the 60–day notice expires.

5 U.S.C. § 8425(c). The plaintiff turned 57 on May 23, 2000. On March 6, 2000, more than 60 days before the date of separation, the Office of the Chief of the Capitol Police sent the plaintiff a letter informing her that May 31, 2000 was her mandatory retirement date and suggesting that the plaintiff contact the employee benefits specialist in the Capitol Police Employee Services Section to discuss her retirement. *See* Reply, Ex. 2. Without receiving the completed retirement papers from the plaintiff, the defendant retired her on May 31, 2000. The plaintiff admits that she did not sign the necessary paperwork to receive her retirement annuity and states that she did not consent to retirement. *See* Raymond Aff. at 3. Title 5, however, mandates retirement on the last day of the month in which an officer turns 57 years old, with or without the officer's consent. *See* 5 U.S.C. § 8425(c). Accordingly, an unambiguous statute dictated the defendant's actions, and, therefore, those actions do not constitute an adverse employment action.

Lastly, the plaintiff claims that she was retired without being released by her doctor. *See* Pl.'s Opp'n at 22. The plaintiff, however, fails to provide any support for the notion that a doctor's release is a prerequisite to mandatory retirement. Title 5 U.S.C. § 8425(c) does not mention such a requirement. It is the plaintiff's responsibility to apply for benefits, not the defendant's. Accordingly, because the defendant complied with Title 5 U.S.C. § 8425(c), there was no adverse employment action, and the court grants the defendant's motion for summary judgment on Count III.

## IV. CONCLUSION

For all these reasons, the court grants the defendant's motion for summary judgment on all counts. An order directing the parties in a fashion consistent with this Memorandum Opinion is separately and

contemporaneously issued this 26th day of July, 2001.

### *ORDER*

#### GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated in this court's Memorandum Opinion separately and contemporaneously issued this 26th day of July, 2001, it is

**ORDERED** that the defendants' motion for summary judgment shall be and hereby is **GRANTED**.

**SO ORDERED.**